IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**Chalumeau Power Systems LLC,**

Plaintiff;

v.

Civil Action No. 11-1175-RGA

**Alcatel-Lucent, Alcatel-Lucent USA Inc.,
and Alcatel-Lucent Holdings Inc.,**

Defendants.

MEMORANDUM OPINION

Brian E. Farnan, Esq., Farnan LLP, Wilmington, DE; James A. Jorgensen, Esq. (argued), Lee, Jorgensen, Pyle & Kewalramani, P.C., Houston, TX, attorneys for Plaintiff.

Jack B. Blumenfeld, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; J. Anthony Downs, Esq., Goodwin Procter LLP, Boston, MA; Lana S. Shiferman, Esq. (argued), Goodwin Procter LLP, Boston, MA; Robert Frederickson III, Esq., Goodwin Procter LLP, Boston, MA, attorneys for Defendants.

October 30 , 2013

ANDREWS, U.S. District Judge:

Pending before this Court is the issue of claim construction of various disputed terms found in U.S. Patent No. 5,991,885.

## I. BACKGROUND

On November 29, 2011 Chalumeau Power Systems LLC ("Plaintiff") filed a patent infringement action (D.I. 1) against Alcatel-Lucent, Alcatel-Lucent USA Inc., and Alcatel-Lucent Holdings Inc. On September 12, 2012 the Court granted defendant Alcatel-Lucent's motion to dismiss for lack of personal jurisdiction. (D.I. 58). The Court has considered the Parties' Joint Claim Construction Brief. (D.I. 93). The Court held oral argument on the disputed claim terms on September 20, 2013.

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324). When construing patent claims, a matter of law, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."

1

*Phillips*, 415 F.3d at 1315 (internal quotations and citations omitted).

Furthermore, "the words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. (internal citations omitted).

A court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," in order to assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Id.* at 1317-19 (internal quotation marks and citations omitted). However, extrinsic evidence is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

Finally, "[a] claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation

2

omitted).

## III. CONSTRUCTION OF DISPUTED TERMS

A. *"user interface connector"*

1. *Plaintiff's proposed construction*: "a multi-pin connector through which both data and electrical power can be transmitted."

2. *Defendants' proposed construction*: "connector that is separate from the network hub for connecting to remote devices."[1]

3. *Court's Construction*: "connector that is separate from the network hub."

The Plaintiff argues that its construction is consistent with the specification and the capabilities of the user interface connector. (D.I. 93 at 6). Defendants assert that the term should be construed according to its plain meaning and the patent's use of the term. (D.I. 93 at 9). Furthermore, the Defendants point out that Plaintiff's proposed construction does not distinguish "user interface connectors" from the other connectors described in the patent, such as "hub user connectors." *Id*.

The Defendants' proposed construction is more consistent with the specification. In every instance, save for a few apparent typos, the specification describes the user interface connectors as being physically separate from the network hub. (*see* Figure 2 of '885). While it is indeed the case that the user interface connectors must be coupled to the network hub in order to provide a data connection, it is clear that the user interface connectors themselves are distinct entities separate from the network hub. While Plaintiff argues that using the term "separate" to describe something that is "coupled" is oxymoronic, the Court disagrees. It is perfectly understandable

---

[1] During oral argument the Defendants removed the term "plug" from their proposed construction.

that while the user interface connectors themselves are separate from the hub, they may be coupled to the hub via cable. If a user connects her computer to the network via an Ethernet cable plugged into a modem, one would understand that while the computer and the modem are coupled, they are still separate and distinct objects.

Defendants' proposed construction also includes the term "for connecting to remote devices." However, independent claims 8 and 14 of the '885 patent require "a plurality of user interface connectors each adapted for coupling to a remote device." Construing "user interface connectors" to include "for connecting to remote devices" would be redundant. Even without the "for connecting to remote devices," the "user interface connector" is going to have to be "adapted for coupling to a remote device." Thus, the Court does not see any issue of claim scope in this dispute. Therefore the Court's construction does not include the disputed limitation.

B. *"network hub"*

1. *Plaintiff's proposed construction*: "a device having a plurality of user interface connectors, that is capable of (i) identifying the operational protocol of a coupled device; (ii) communicating data and power to the coupled device when an adapter is identified as present; and (iii) stopping power when the adapter is no longer identified [as] present."

2. *Defendants' proposed construction*: "a device used to provide connectivity between DTEs (Data Terminal Equipment), which performs the basic functions of restoring signal amplitude and timing, collision detection, and notification and signal broadcast to lower-level hubs and DTEs."

3. *Court's Construction*: "a device used to provide connectivity between DTEs

4

> (Data Terminal Equipment). Hubs perform the basic functions of restoring signal
> amplitude and timing, collision detection, and notification and signal broadcast to
> lower-level hubs and DTEs."

The Plaintiff argues that its proposed construction is consistent with the specification and the claims. (D.I. 93 at 18). Defendants argue that their proposed construction should be adopted because it is taken from the IEEE Standard which was incorporated by reference in the '885 patent. (D.I. 93 at 21). In response Plaintiff argues that the particular IEEE Standard to which Defendants refer is the incorrect standard. (D.I. 93 at 20).

Plaintiff's proposed construction conflicts with the Court's construction of the term "user interface connector." Furthermore, the portion of the specification which Plaintiff cites to for the inclusion of "user interface connectors" in the network hub refers to a different component, "hub user connectors," which are referenced with a different number (208) than user interface connectors (204). (*see* Col. 7 lines 20-21 of '885). Additionally, Plaintiff's proposed construction merely seeks to define "network hub" as doing what the claims require, which does not aid in determining the metes and bounds of the term "network hub."

Defendants' proposed construction is taken directly from the technical standard which the patent incorporated by reference and correctly explains what the term "network hub" would have meant to the person of ordinary skill at the time of the invention. There is no credible evidence that the 802.3u standard from which Defendants extract their proposed construction was not part of the general 802.3 standard incorporated by reference in the patent. Because Plaintiff's proposed construction is really no construction at all, and because Defendants' construction is taken directly from the IEEE 802.3u standard, which was incorporated by reference in the patent,

5

the Court adopts Defendants' construction.

C. *"for identifying the operational protocol of a coupled device that indicates the type of device"*

1. *Plaintiff's proposed construction*: "having the capability of identifying the operational protocol of a coupled device that indicates its type."

2. *Defendants' proposed construction*: plain and ordinary meaning.

3. *Court's Construction*: "having the capability of identifying the operational protocol of a coupled device that indicates its type."

The Plaintiff argues that this term be construed according to its capability and functionality. (D.I. 93 at 33). Defendants respond that the term should be given its plain and ordinary meaning and therefore no construction is necessary. (D.I. 93 at 34). More accurately, Defendants respond that there is no dispute regarding the term in the first place and therefore no construction is necessary. *Id*. While it is uncertain whether Plaintiff's proposed construction is necessary, it is technically accurate, and therefore the Court will adopt that construction. It seems that the real dispute regarding this term has to deal with the construction of "type of device," which is dealt with below.

D. *"for identifying the presence of an adapter of a first type"*

1. *Plaintiff's proposed construction*: "having the capability of identifying the presence of an adapter of a particular type."

2. *Defendants' proposed construction*: "for identifying the presence of an infrared adapter or other wireless adapter."

3. *Court's Construction*: "having the capability of identifying the presence of a

6

wireless adapter."

The dispute here hinges on whether an "adapter of a first type" is limited to wireless adapters. The specification refers to adapters of a first type, second type, and third type. For instance, Figure 6a shows an adapter of a first type, Figure 6b shows an adapter of a second type, and Figure 6c shows an adapter of a third type. (Col. 4 lines 17-26 of '885). Only the adapter of a first type receives power, as the adapters of a second type and adapters of a third type lack the circuitry to request power. (Col. 12 lines 9-43). Clearly then, an "adapter of a first type" cannot be just an "adapter of a particular type," as that would include adapters of a "second" and "third" type, which do not receive power.

The specification shows that an adapter of a first type may be an infrared adapter. (Col. 10 lines 8-12 of '885). Additionally, the adapter of a first type "may provide wireless coupling other than infrared, such as radio frequency." (Col. 5 lines 66-67). While the Plaintiff argues that the claims are not limited to wireless adapters, the specification makes clear that powering wired adapters was not envisioned. The specification states that the network hub "provide[s] the electrical power to the detected device when the presence of the detected device is confirmed, and does not provide electrical power...when ... adapters of another type (such as Ethernet 10Base-T, 100Base-TX 100 Base-T4, and Token Ring adapters) are connected." (Col. 4 lines 50-58 of '885). In every embodiment where an adapter receives power, the adapter is an infrared adapter. The specification makes clear that this adapter could be another wireless adapter, but clearly does not contemplate a wired adapter, and indeed teaches away from powering a wired adapter. In light of this, the Court's claim construction requires that the adapter is a wireless adapter. An infrared adapter is one kind of wireless adapter. The Court sees no reason to call out

7

a particular type of wireless adapter.

E. *"type of device"*

1. *Plaintiff's proposed construction*: "device operational protocol and electrical power requirements."

2. *Defendants' proposed construction*: "device classified by its operational protocol (for example, a Token Ring device uses a Token Ring protocol, an ethernet device uses an ethernet protocol, and an IR device uses an IR protocol)."

3. *Court's Construction*: "device classified by its operational protocol."

The dispute over this term is whether "type of device" includes the device's electrical power requirements. Plaintiff argues that including electrical power requirements in the definition of "type of device" is consistent with the specification. (D.I. 93 at 47). Defendants argue that by including electrical power requirements in the construction, the claim will cover applications that are outside the scope of the invention. (D.I. 93 at 49). Specifically, Defendants contend that the specification makes clear that the decision to supply power is based solely on the operational protocol of the device, and that the invention cannot recognize different electrical requirements of devices using the same operational protocol. (D.I. 93 at 50-51).

At the outset, the Court notes that this term's use in the claims is not a model of clarity. Claim 8 of '885 requires that the network hub "identif[ies] the operational protocol of a coupled device that indicates the type of device." It is not clear how identifying the type of device based on its operational protocol accomplishes anything that is not also accomplished simply by identifying the operational protocol. If, for example, the network hub identifies that a coupled device is using an Ethernet protocol, then it is an Ethernet device. Once the network hub

8

identifies the operational protocol indicating the type of device, it "continuously provid[es] electrical power to the adapter according to the type of device in response to the identified presence of said adapter..." (Claim 8 of '885). Understanding that "type of device" really just refers to the operational protocol, the claim might as well read, "identif[ies] the operational protocol of a coupled device [and] continuously provid[es] electrical power to the adapter according to the operational protocol."

Plaintiff's proposed construction would make claim terms redundant and rewrite the specification. If the "type of device" indicated the electrical requirements of the device, then there would be no need for the further step of "providing electrical power to the adapter...in response to the identified presence of said adapter..." (Claim 8 of '885). If the network hub can communicate with the device, then it should know that it is present. Based upon the specification it is clear that the invention only provides electrical power for wireless protocols. "If the network 201 determines that another type of device other than an IR adapter 206 is coupled to a user interface connector 204, the network 201 does not apply electrical power." (Col. 5 lines 60-63 of '885). Taken in this context then, "type of device" is merely a clarification that indeed the claims do not cover providing electrical power to wired protocols.

F. *"operational protocol/operational protocol of a coupled device"*

1. *Plaintiff's proposed construction*: "protocol for communicating data."

2. *Defendants' proposed construction*: "media access control layer protocol of the coupled device."

3. *Court's Construction*: "protocol for communicating data."

The Plaintiff argues that its proposed construction is consistent with the specification and

9

that Defendants' proposed construction is unsupported by intrinsic evidence. (D.I. 93 at 58-59). Defendants argue that their proposed construction is proper because the disclosed CSMA/CD and Token Ring protocols are media access control layer protocols. (D.I. 93 at 60). Neither side appears to disagree that an "operational protocol" is a "protocol for communicating data," but Defendants would like to limit the "protocol for communicating data" to the disclosed embodiments.

While Defendants' proposed construction appears to be a correct definition of CSMA/CD and Token Ring protocols, the Court is not inclined to restrict the disputed term to solely these embodiments. The skilled artisan would appreciate that while the disclosed protocols might be of a particular kind, the invention may cover other protocols. What is certain is that "operational protocols" refer to communicating data, which is how the Court construes the term.

G. *"adapter"*

      1. *Plaintiff's proposed construction*: "a network interface device that is capable of receiving electrical power and data from the network hub."

      2. *Defendants' proposed construction*: "a device that provides a compatible connection between the network hub and remote device at the physical layer."

      3. *Court's Construction*: "a network interface device that is capable of receiving data from the network hub and that connects the network hub to a remote device."

The Plaintiff argues that its proposed construction is consistent with the specification and that Defendants' proposed construction is unsupported by intrinsic evidence. (D.I. 93 at 66-67). Defendants argue that their proposed construction is proper because the conversion from a wireless communication to a wired communication occurs at the physical layer. (D.I. 93 at 69).

Furthermore, Defendants point out that the Plaintiff's proposed construction imports functional limitations that appear elsewhere in the claim. *Id.*

The dispute here is easily resolved when the Court's previous constructions are taken into account. An adapter may be part of a remote device or an intermediate device, but an adapter of a first type, which is the only type that receives power, is necessarily an intermediate device as it is limited to a wireless adapter. Taking this into account, the Court's construction encompasses both types of adapters, some of which cannot receive electrical power.

## IV. CONCLUSION

Within five days the parties should submit a proposed order consistent with this opinion suitable for submission to the jury.

11